**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

ANTONIO BRITTO FILHO, an individual,

        Plaintiff,                              CASE NO.:

v.

PARQUE TOWERS DEVELOPERS, LLC,
a Florida limited liability company, and
FIRST AMERICAN TITLE INSURANCE COMPANY,
a California Corporation,

        Defendants.
_____/

## COMPLAINT FOR DAMAGES

Plaintiff, Antonio Britto Filho ("Mr. Britto" or "Plaintiff"), sues Defendants, Parque

Towers Developers, LLC ("Parque Towers"), and First American Title Insurance Company ("First

American Title") (collectively, "Defendants"), and in support thereof he states as follows:

## NATURE OF THE ACTION

1.      This is a civil action for damages based on breach of contract with respect to a

condominium development in Miami-Dade County, Florida, in an amount exceeding $75,000.00,

exclusive of interest, attorney's fees, and costs.

## PARTIES AND JURISDICTION

2.      Plaintiff Mr. Britto is an individual who is otherwise *sui juris*, a Brazilian national,

and domiciled in Miami-Dade County, Florida.

3.      Defendant Parque Towers is a Florida limited liability company, whose primary

business is the development and construction of the condominium development commonly known

as the Parque Towers Condominium (the "Development" or "Condominium Project") in Miami-

Dade County, Florida. Parque Towers maintains a registered address in Miami-Dade County located at 3211 Ponce de Leon Blvd., Suite 301, Coral Gables, Florida 33134.

4.      Parque Towers is a registered and licensed developer in the State of Florida. Specifically, Parque Towers is licensed by the Florida Department of Business and Professional Regulation to develop, market, and sell residential pre-construction condominium units in its state-registered Parque Towers Condominium Project.

5.      Defendant First American Title is a California corporation, and is the escrow agent for the transaction contemplated in that certain Purchase Agreement, including all amendments and addenda thereto, entered into by and between Plaintiff Mr. Britto, as purchaser, and Defendant Parque Towers, as seller (the "Purchase Agreement").  *See* **Exhibit A**, Purchase Agreement.  First American Title maintains a registered address at 1 First American Way, Santa Ana, California 92707.  First American Title is, upon information and belief, in possession of certain funds, whose ownership is at issue in this action.  First American Title is named as a **nominal party only** since no claims are being brought against it, and it is named only to afford this Court jurisdiction over certain funds that are at the center of the controversy and to avoid the necessity of its joinder through interpleader.

6.      Personal jurisdiction over Defendant Parque Towers is proper pursuant to Section 43 of the Purchase Agreement, whereby the parties thereto have agreed that, in the event of any litigation between them under the Purchase Agreement, they "shall and hereby submit to the jurisdiction of the state and federal courts of the State of Florida." *Id.* ¶ 43.  Personal jurisdiction over Defendant Parque Towers is proper because it is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida and because it conducts ongoing and systematic business activities in Miami-Dade County, Florida.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

7.      Personal jurisdiction over Defendant First American Title is proper because it conducts ongoing and systematic business activities the State of Florida.

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 (a), which confers original jurisdiction in "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between … citizens of a State and citizens or subjects of a foreign state…". In this action, Plaintiff is seeking the return of his security deposit in the amount of $642,500.00 plus interest, attorney's fees and costs. *See* **Exhibit B**, First American Title Letter Dated April 2, 2019 acknowledging the deposits received from Plaintiff in connection with the Purchase Agreement.

9.      Under 28 U.S.C § 1332(a)(1) and (2), diversity exists between "(1) citizens of different States; or between (2) citizens of a State and citizens or subjects of a foreign state." "The existence of diversity of citizenship is determined at the time the suit is instituted, and not when the cause of action arose." *Yeldell v. Tutt*, 913 F.2d 533, 537 (8th Cir. 1990) (citing *Smith v. Sperling*, 354 U.S. 91, 93 n.1 (1957)).

10.     At the time the filing of this action there is full diversity of citizenship between Plaintiff and Defendants because:

    a.      The Plaintiff Antonio Britto Filho is a citizen and national of Brazil that resides in Florida, but is not a lawful permanent resident of the United States;

    b.      Defendant Parque Towers is a Florida limited liability company and all of its members are U.S. citizens and/or lawful permanent residents of the United States that reside in the United States and/or its territories; and

    c.      Defendant First American Trust is a California corporation with its principal place of business in Santa Ana, California

3

## GENERAL ALLEGATIONS

11.    On or about December 27, 2014, Mr. Britto and Parque Towers entered into a residential pre-construction Purchase Agreement wherein Mr. Britto agreed to purchase, and Parque Towers agreed to sell, Unit No. 5-1907 (the "Unit") in the Condominium Project being built by Parque Towers.  A true and correct copy of the Purchase Agreement is attached as **Exhibit A**.

12.    The agreed purchase price for the Unit was $1,285,000.00.  *Id.*  As required by the payment schedule contained in the Purchase Agreement, Mr. Britto has provided multiple deposits to Parque Towers in the aggregate amount of $642,500.00.  *Id.*; *see also* **Exhibit B**.

13.    At no time prior to the execution of the Purchase Agreement or during the prepayment schedule did Parque Towers advise Mr. Britto that there were any issues related to the construction site of the Condominium Project that would necessitate any change in the completion dates or closing date of the Unit.

14.    Pursuant to the express terms of the Purchase Agreement, Plaintiff tendered all prepayments as scheduled.

15.    Pursuant to the express terms of the Purchase Agreement, construction on the Unit was to be "substantially complete" on or before December 31, 2017 (the "Outside Date").  *See* **Exhibit A** at ¶ 7.  More relevant to this action, the Purchase Agreement further provides that closing "**shall in no event be scheduled later than one (1) year following the Outside Date [December 31, 2018]**."  *Id.* at ¶ 9 (emphasis added).

16.    As of April 19, 2019, the date of the commencement of this action:

a.    the Unit is not substantially complete, as it should have been by December 31, 2017; and,

b.    the Closing did not occur, as it should have, by December 31, 2018.

4

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

17.     Although there have been several communications from Parque Towers and/or its representatives assuring Mr. Britto that the Development would close soon, the Unit is still not substantially complete, and the Closing has not occurred.

18.     On March 28, 2019, Plaintiff's counsel served upon Parque Towers a formal notice of its default as Seller under the Purchase Agreement (the "Notice of Default").  *See* **Exhibit C**, Notice of Default.   Pursuant to the Purchase Agreement, Parque Towers was given twenty (20) days (until April 18, 2019) from the date of Plaintiffs letter to cure its default, and if it is unable to do so, "the Agreement shall be deemed terminated and Buyer demands that its deposits and the amounts paid for any upgrades be immediately returned to Buyer. If Seller fails to cure its default or return all of Buyer's funds, Buyer will seek such remedies that are available at law and equity." *Id.*

19.     Parque Towers failed to cure its default by April 18, 2019 as required by the Purchase Agreement, continues to be in default, and has not returned any monies to the Plaintiff.

20.     Counsel for Parque Towers, in response to Mr. Britto's Notice of Default, stated in a letter to the undersigned counsel that "your demand for the return of the deposit funds is rejected." *See* **Exhibit D**, Correspondence from Robert P. Frankel, Esq. to Rodrigo Da Silva, Esq. dated April 1, 2019.  Parque Towers further contends that, contrary to its expressly stated obligations under the Purchase Agreement, "[t]he project did experience significant delays including but not limited to force majeure events – Hurricane Irma – other related factors, geological and unforeseen conditions and several other events." *Id.*  However, Parque Towers was obligated to close **within one year following the Outside Date required by mandatory and unambiguous language in the executed Purchase Agreement under paragraph 9**. *See* **Exhibit A** ¶ 9.  Parque Towers was

required to close by December 31, 2018, and therefore Parque Towers is in default and it failed to cure it's default by April 18, 2019.

21.     Greater than twenty (20) days have elapsed since Plaintiff made his demand to Parque Towers in the Notice of Default.

22.     Plaintiff has retained the undersigned counsel to prosecute this action and is obligated to pay them a reasonable fee.  Pursuant to the provisions of Section 43 of the Purchase Agreement, Mr. Britto is entitled to recover his attorneys' fees and costs should he prevail in this case.  Mr. Britto is also entitled to recover pre-judgement interest from Defendant Parque Towers on all funds provided to Parque Towers by Plaintiff.

23.     All conditions precedent to the filing of this action have been satisfied, waived, or otherwise excused.

### COUNT I - BREACH OF CONTRACT (against Defendant Parque Towers)

24.     Plaintiff re-alleges paragraphs 1 through 23 as fully set forth and incorporated herein.

25.     Plaintiff and Defendant Parque Towers entered into a valid contract, in the form of the residential pre-construction Purchase Agreement dated on or about December 27, 2014, wherein Mr. Britto agreed to purchase, and Parque Towers agreed to sell, Unit No. 5-1907 in the Condominium Project being built by Parque Towers.  Plaintiff has fully performed all of his contractual obligations under the Purchase Agreement.

26.     Pursuant to the express terms of the Purchase Agreement, the Unit was to be "substantially complete" on or before December 31, 2017 and Closing thereon was to be scheduled "by no later than December 31, 2018."  *See* **Exhibit A** ¶¶ 7, 9.

27.     As of April 18, 2019, the date of the commencement of this action:

    a.    the Unit is not substantially complete, as it should have been by December 31, 2017; and

    b.    the Closing did not occur, as it should have, by December 31, 2018.

28.    As such, Defendant Parque Towers is in default under the Purchase Agreement.

29.    On March 28, 2019, more than a year after the December 31, 2017 substantial completion date and after the closing deadline, in accordance with Sections 13 and 21 of the Purchase Agreement, Plaintiff sent Defendant Parque Towers, via Federal Express and electronic mail, served notice of Seller's default with a 20-day cure period, and a demand for the return of all funds Plaintiff has paid to Parque Towers in the form of the deposits for the Unit.  *See* **Exhibit C**.

30.    Parque Towers failed to cure its default by the April 18, 2019 deadline, continues to be in default to this day, has not returned any monies to the Plaintiff, and has memorialized its refusal to return any portion of the $642,500.00 deposit that Plaintiff has made.  *See* **Exhibit D**. Parque Towers has breached the Purchase Agreement with Plaintiff.

31.    As a direct and proximate result of Parque Towers' breach of the Purchase Agreement, Plaintiff has suffered monetary damages.

**WHEREFORE**, Plaintiff demands judgment against Defendant Parque Towers for the return of all funds previously provided by Plaintiff to Parque Towers, for damages resulting from Parque Towers' breach of the Purchase Agreement, for pre-judgement interest accrued since the time of delivery of the deposits, for reasonable attorneys' fees pursuant to the fee-shifting provision contained in Section 43 of the Purchase Agreement, ordering First American Title to return to Plaintiff any funds held by it in escrow on behalf Plaintiff relating to the Purchase Agreement,  and for any other further relief that this Court deems just and appropriate.

Dated: April 19, 2019               Respectfully submitted,

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.

LAW OFFICES OF RODRIGO S. DA SILVA, P.A.
777 Arthur Godfrey Road, Suite 402
Miami Beach, Florida 33140
E-mail: rodrigo@rdasilvalaw.com
Telephone:     (305) 615-1434
Facsimile:     (305) 615-1435

By:     /s/ *Rodrigo S. Da Silva*
        Rodrigo S. Da Silva, Esq.
        Florida Bar No. 0088600
        Kimberly De La Cruz
        Florida Bar No. 1007934
        *Counsel for Plaintiff, Antonio Britto Filho*

# EXHIBIT A

UNIT: __5-1907__                                UNIT TYPE: __B__
PURCHASER: __ANTONIO BRITTO FILHO__

PARQUE TOWERS, A CONDOMINIUM

**PURCHASE AGREEMENT**

**ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER.  FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.**

**ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.**

In this Agreement, the term "Purchaser" or "Buyer" means or refers to the Purchaser or Purchasers listed below who have signed this Agreement.  The word "Seller" means or refers to Parque Towers Developers, LLC, a Florida limited liability company.

If the first letter of a word is capitalized in this Agreement, that word will have the meaning given to it in this Agreement or in the Declaration (as defined in paragraph 1 of this Agreement).

Purchaser(s):  __ANTONIO BRITTO FILHO__

Purchaser(s):  _____

Address:  __RUA JACUNDA 380, CASA 21__

__MORUMBI__

| | | |
|---|---|---|
| City: __SAO PAULO__ | State: __SP__ |
| Country: __BRASIL__ | Zip Code:__05679 060__ |
| Cell No: __011 55 11 98111 0749__ | Office Phone:_____ |
| Home Phone: _____ | Fax No._____ |
| Email Address: __ANTONIO.BRITTO@INTERFARMA.ORG.BR__ | Other No._____ |

1.  <u>Purchase and Sale</u>.  Purchaser agrees to buy, and Seller agrees to sell (on the terms and conditions contained in this Agreement), Unit __5-1907__, Unit Type __B__, (the "Unit") in **PARQUE TOWERS, A CONDOMINIUM** (the "Condominium"), created by the Declaration thereof recorded in Official Records Book 28957, at Page 68, of the Public Records of Miami-Dade County, Florida, as amended (the "Declaration").  The Unit and the Condominium are described in greater detail in the Declaration included in the Prospectus for the Condominium and the Exhibits attached thereto (collectively, the "Condominium Documents").  Purchaser acknowledges receipt, on or before the date of this Agreement, of the Condominium Documents and all documents required by Section 718.503, Florida Statutes, to be furnished by a developer to a Purchaser.

2.  <u>Payment of the Purchase Price</u>.  The total purchase price ("Purchase Price") for the Unit is $ __1,285,000.00__.  Purchaser agrees to make payments towards the Purchase Price as follows:

| Payment | Due Date | Amount |
|---|---|---|
| Deposit from Reservation Agreement, if any | Upon execution of the Reservation Agreement | $ __10,000.00__ |
| Balance of Initial 20% Deposit | Upon execution of this Agreement. | $ 247,000.00 |
| Additional 20% Deposit | At groundbreaking. | $ 257,000.00 |
| Additional 10% Deposit | At pouring of slab for the floor of the Unit | $ 128,500.00 |
| Balance | At Closing. | $ 642,500.00 |
| Total Purchase Price | | $ 1,285,000.00 |

Purchase Agreement                    Page 1 of 17            **Purchaser's Initials:** ____

UNIT: _____ **5-1907** _____ UNIT TYPE: ____ **B** _____
PURCHASER: __ **ANTONIO BRITTO FILHO** _____

Deposits may be made by personal check (subject to clearance), cashier's check or wire transfer of Federal Funds.  The balance due at closing must be paid by bank cashier's check or wire transfer of federal funds.  All payments must be made in United States funds and all checks must be payable on a bank located in the continental United States. If Purchaser fails to pay any deposit on time, and Seller agrees to accept it on a later date (which Seller is not obligated to do), Purchaser will pay a late funding charge equal to interest on such deposit at the then applicable highest lawful rate from the date due until the date received by Seller and cleared by the bank on which it is drawn.

Purchaser also agrees to pay all closing costs and other sums required to be paid by Purchaser in this Agreement.  These charges are subject to change as provided in paragraph 11 of this Agreement and are explained in more detail in that paragraph, as are other closing costs which cannot be computed at this time.

3.      How Purchaser Pays.  Purchaser understands and agrees that Purchaser will be obligated to pay "all cash" at closing.  This Agreement and Purchaser's obligations under this Agreement to purchase the Unit will not depend on whether or not Purchaser qualifies for or obtains a mortgage from any lender.  Purchaser will be solely responsible for making Purchaser's own financial arrangements. Seller agrees, however, to cooperate with any lender Purchaser chooses and to coordinate the closing with such lender, if, but only if, such lender meets the Seller's closing schedule and pays Seller the proceeds of its mortgage at closing in the same manner as specified above with respect to the payment of the balance due at closing.

Although Seller does not have to do so, if Seller agrees to delay the closing until Purchaser's lender is ready, or to wait for funding from Purchaser's lender until after closing, or to accept a portion of the sums due at closing in the form of a personal check, Purchaser agrees to pay Seller a late funding charge equal to interest, at the then highest applicable lawful rate on all funds due Seller which have not then been paid to Seller (and, with regard to personal checks, which have not then cleared) from the date Seller originally scheduled the closing to the date of actual payment (and, with regard to personal checks, to the date of final clearance).  This late funding charge may be estimated and charged by Seller at closing.  Seller's estimate will be adjusted after closing, based on actual funding and clearance dates, upon either Seller's or Purchaser's written request.  In the event that Purchaser's lender does not pay Seller all proceeds at closing, Purchaser will not be allowed to take possession of the Unit until Seller actually receives all required funds and they have cleared.  The foregoing paragraph will survive (continue to be effective after) the closing.

4.      Deposits.  Except as permitted below, all of Purchaser's deposits up to ten percent (10%) of the Purchase Price will be held in escrow by FIRST AMERICAN TITLE INSURANCE COMPANY, with offices at 13450 West Sunrise Blvd., Suite 300, Sunrise, Florida 33323, in accordance with the escrow agreement contained in the Condominium Documents.  The escrow agreement is incorporated into this Agreement as if repeated at length here, and Purchaser agrees that the deposits may be held in any depository which meets the requirements of the Act, including, without limitation, a financial institution chartered and located out of the State of Florida.

Purchaser agrees that all of Purchaser's deposits in excess of ten percent (10%) of the Purchase Price may be used by Seller for construction and development purposes as permitted by law. Additionally, Seller may use Buyer's deposits up to ten percent (10%) of the Purchase Price as and to the extent permitted by applicable law.  If Seller has obtained, or obtains, the approval of the Director of the Division of Florida Condominiums, Timeshares and Mobile Homes to provide "Alternative Assurances," as permitted by law, in lieu of holding deposits up to ten percent (10%) of the Purchase Price in escrow, Seller may cause the escrow agent to disburse such deposits to it for all uses permitted by law.  If Seller has obtained such approval as of the date of this Agreement, a copy of the Escrow Agreement providing the mechanism for such disbursement has been delivered to Buyer.  Likewise, if such approval is obtained after the date of this Agreement, Buyer will be provided with a copy of the Escrow Agreement, but Buyer agrees that it shall not be deemed a material or adverse change in the offering of the Condominium by reason of the fact that Buyer has already agreed to the use of Buyer's deposits up to ten percent (10%) of the Purchase Price in the manner stated above.

If Purchaser so requests, Purchaser may obtain a receipt for Purchaser's deposits from the escrow agent.  Seller may change escrow agents (as long as the new escrow agent is authorized to be an escrow agent under applicable Florida law), in which case Purchaser's deposits (and any interest actually earned on them) may be transferred to the new escrow agent at Seller's direction.  At closing, all deposits not previously disbursed to Seller shall be released to Seller.  Except where expressly provided herein to the contrary or otherwise required by law, all interest earned on Purchaser's deposits shall accrue solely to the benefit of Seller, and shall not be credited against the Purchase Price of the Unit. Except where expressly provided herein, Purchaser agrees that to the extent deposit monies are used for construction and development purposes, said monies are not available for investment, and accordingly do not earn interest.  No interest will be assumed to be earned, unless in fact said sums are invested in an interest bearing account and do, in fact, earn interest, except where expressly provided herein.

UNIT: _____**5-1907**_____   UNIT TYPE: ____**B**_____

PURCHASER: __**ANTONIO BRITTO FILHO**_____

Except only in the event of a default by Seller, or in the event Buyer properly terminates this Agreement pursuant to its terms or pursuant to Chapter 718 of the Florida Statues, all interest earned on Purchaser's deposits shall accrue to the benefit of Seller.

5. <u>Seller's Financing</u>.  Seller may borrow money from lenders for the acquisition, development and/or construction of the Condominium.  Purchaser agrees that any lender advancing funds for Seller's use in connection with the Condominium will have a prior mortgage on the Unit and the Condominium until closing. At that time, Seller shall cause the then applicable mortgages to be released as an encumbrance against the Unit and may use Purchaser's closing proceeds for such purpose.  Neither this Agreement, nor Purchaser's payment of the deposits required hereunder, will give Purchaser any lien or claim against the Unit or the Condominium.  Without limiting the generality of the foregoing, Purchaser's rights under this Agreement will be subordinate to all mortgages (and all modifications made to those mortgages) affecting the Unit and/or the Condominium, even if those mortgages (or modifications) are made or recorded after the date of this Agreement.

6. <u>Insulation; Energy Efficiency</u>.  Seller has advised Purchaser, as required by the rules of the Federal Trade Commission, that it intends, currently, to install (in connection with the construction of the Unit, the following insulation:

| <u>Type</u> | <u>Thickness</u> | <u>R-Value</u> | <u>Location</u> |
|---|---|---|---|
| Single ply roofing over light weight concrete | Varies | R-19 | Roof |
| Foil | 1/8" | R-4 | Perimeter Exterior Walls |
| Batt | 3½" | R-11 | Corridor and Demising Walls |

This R-value information is based solely on the information given by the appropriate manufacturers and Purchaser agrees that Seller is not responsible for any manufacturers' errors.

To the extent required by applicable law, each purchaser may have the energy efficiency rating of the Condominium building determined.  Purchaser also acknowledges receipt of the information brochure prepared by the Florida Department of Community Affairs regarding energy efficiency ratings.

All insulation and energy efficiency rating information is subject to Seller's rights, under this Agreement, to make changes in Seller's Plans and Specifications, and to limit Seller's liability to Purchaser.

7. <u>Completion Date</u>.  Seller estimates it will substantially complete construction of the Unit, in the manner specified in this Agreement, by December 31, 2017, subject to extensions resulting from "Force Majeure" (the "Outside Date").  The term "Force Majeure", as used in this Agreement, shall mean "Acts of God", labor disputes (whether lawful or not), material or labor shortages, restrictions by any governmental or utility authority, civil riots, floods or other causes beyond Seller's control.  Notwithstanding the foregoing or any other contrary provision of this Agreement, Seller shall have the right to cancel this Agreement and cause Purchaser's deposits to be refunded in the event that Seller does not enter into binding contracts to sell at least eighty percent (80%) of the units in the Condominium.  Seller must, however, notify Purchaser of such a termination within one (1) year following the date of this Agreement, otherwise Seller will be required to use its commercially, reasonable good faith effort to construct the Condominium and the Unit and otherwise proceed to perform its obligations under this Agreement. This paragraph shall not delay the effectiveness of this Agreement, which shall be immediate, but, rather, shall be deemed a "condition subsequent" to this Agreement.  In the event of Seller's termination of this Agreement pursuant to this paragraph, upon such termination and the return of Purchaser's deposits, Seller and Purchaser will be fully relieved and released from all obligations and liabilities under and/or in connection with this Agreement.  Seller agrees to use its good commercially, reasonable efforts to meet the foregoing pre-sale requirement.

8. <u>Inspection Prior to Closing</u>.  Purchaser will be given an opportunity prior to closing, on the date and at the time scheduled by Seller, to inspect the Unit with Seller's representative.  At that time, Purchaser will sign an inspection statement listing any defects in workmanship or materials (only within the boundaries of the Unit, itself) which Purchaser discovers.  If any item listed is actually defective in workmanship or materials in Seller's opinion (keeping in mind the construction standards applicable in Miami-Dade County, Florida for similar property), Seller will be obligated to correct those defects, at its cost, within a reasonable period of time after closing, but Seller's obligation to correct any such defects will not be grounds for deferring the closing, nor for imposing any condition on closing.  No escrows or holdbacks of closing funds will be permitted.  If Purchaser fails to take advantage of the right to a pre-closing inspection on the scheduled date and time, Seller will not be obligated to reschedule an inspection prior to closing.

UNIT: _____5-1907_____   UNIT TYPE: ____B_____
PURCHASER:__ANTONIO BRITTO FILHO_____

Purchaser acknowledges that all matters pertaining to the initial construction of the Unit will be handled by Seller and Seller's representatives.   Purchaser agrees not to interfere with or interrupt any workmen at the site of the Unit.   No personal inspections (other than the one pre-closing inspection) will be permitted.   Purchaser acknowledges that Seller is not obligated to agree to provide any extras or options.

Purchaser can examine Seller's Plans and Specifications at Seller's business office, located on site during regular business hours by making an appointment to do so in advance.

9.      Closing Date.  Purchaser understands that Seller has the right to schedule the date, time and place for closing, which shall in no event be scheduled later than one (1) year following the Outside Date.

Before Seller can require Purchaser to close, however Seller must obtain a temporary, partial or permanent certificate of occupancy for (or covering) the Unit from the proper governmental agency (a certificate of occupancy being the official approval needed before a unit may be lived in), but, subject and subordinate to the provisions of Sections 8 and 35 of this Agreement (without limiting the generality of those provisions by this specific reference), the Common Elements and other portions of the Condominium Property need not then have certificates of occupancy, nor be completed, provided, however, that no closing shall occur unless the certificate of substantial completion described in Section 718.104(4)(e), F.S. shall first have been recorded.   Seller does however, agree to complete those amenities, roads, streets and facilities for water, sewer, gas and electrical service within a reasonable time following closing and otherwise in accordance with the terms of the Property Report dated February 3, 2014 that was delivered to Purchaser prior to Purchaser's execution of this Agreement.

Purchaser will be given at least ten (10) days' notice of the date, time and place of closing. Seller is authorized to postpone the closing for any reason and Purchaser will close on the new date, time and place specified in a notice of postponement (as long as at least three (3) days' notice of the new date, time and place is given).  A change of time or place of closing only (one not involving a change of date) will not require any additional notice period.   Any formal notice of closing, postponement or rescheduling may be given orally, by telephone, telegraph, telex, telecopy, mail, email or other reasonable means of communication, at Seller's option.  All of these notices will be sent or directed to the address, or given by use of the information specified on Page 1 of this Agreement, unless Seller has received written notice from Purchaser of any change prior to the date the notice is given.  These notices will be effective on the date given or mailed (as appropriate).   An affidavit of one of Seller's employees or agents stating that this notice was given or mailed will be conclusive.

After the notice is given or mailed, and if requested in writing by Purchaser, Seller will send a written confirmation of the closing, together with a draft closing statement and other pertinent information and instructions.   This written confirmation is given merely as a courtesy and will not be considered the formal notice to close.   Accordingly, it does not need to be received by any particular date prior to closing.  Purchaser agrees, however, to follow all instructions given in any such formal notice and written confirmation.

If Purchaser fails to receive any of these notices because Purchaser failed to advise Seller of any change of address or phone, telecopy or telex number, because Purchaser has failed to pick up a letter when he has been advised of an attempted delivery or because of any other reason, Purchaser will not be relieved of his obligation to close on the scheduled date unless Seller agrees in writing to postpone the scheduled date.

If Seller agrees in writing to reschedule the closing at Purchaser's request, or if Purchaser is a corporation and Purchaser fails to produce the necessary corporate papers Seller requests and, as a result, closing is delayed, or if the closing is delayed for any other reason (except for a delay desired, requested or caused by Seller), Purchaser agrees to pay, at closing, a late funding charge equal to interest, at the then highest applicable lawful rate, on that portion of the purchase price not then paid to Seller (and cleared), from the date Seller originally scheduled the closing to the date of the actual closing. All prorations will be made as of the originally scheduled date.  Purchaser understands that Seller is not required to reschedule or to permit a delay in closing.

10.      Closing.  The term "closing" refers to the time when Seller delivers the deed to the Unit to Purchaser and ownership changes hands.   Purchaser's ownership is referred to as "title".   Seller promises that the title Purchaser will receive at closing will be good, marketable and insurable (subject to the permitted exceptions listed or referred to below).  Notwithstanding that Purchaser is obligated to pay "all-cash" hereunder, in the event that Buyer obtains a loan for any portion of the Purchase Price and the transaction is governed by the Real Estate Settlement Procedures Act (RESPA), Purchaser shall have the right to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, or Purchaser may elect to have Seller's closing agent issue the title insurance commitment and policy as provided hereinafter.   In the event that the transaction is governed by RESPA and Purchaser elects to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller: (i) Purchaser shall provide Seller with written notice of same within thirty (30) days following Buyer's execution of this Agreement (unless the estimated closing date is

UNIT: _____**5-1907**_____   UNIT TYPE: _____**B**_____

PURCHASER:__**ANTONIO BRITTO FILHO**_____

less than thirty (30) days following the date hereof, in which event, such notice must be given simultaneously with Purchaser's execution of this Agreement) (ii) Seller shall have no obligation to provide a title insurance commitment or policy, or any other evidence of title to Purchaser and (iii) Purchaser shall, no later than five (5) business days prior to closing (or on the date of this Agreement, if the closing is scheduled less than five (5) business days following the date of this Agreement hereinafter the "Objection Deadline"), notify Seller in writing if title is not in the condition required by this Agreement and specify in detail any defect (i.e., any matters which make title other than in the condition pursuant to which same is required to be conveyed to Purchaser), provided that if Purchaser fails to give Seller written notice of any such defect(s) before the expiration of the Objection Deadline, the defects shall, anything in this Agreement notwithstanding, be deemed to be waived as title objections to closing this transaction and Seller shall be under no obligation whatsoever to take any corrective action with respect to same, and title to the Unit shall be conveyed subject to same.

Unless Purchaser has elected, in the manner specified above and if permitted to do so under the conditions set forth above, to obtain a title insurance commitment from its own sources (to the extent that the transaction is governed by RESPA), Purchaser agrees that Seller's designee shall act as closing agent and shall issue the title insurance commitment (and subsequent title insurance policy), which shall be paid for by Seller as provided hereafter.  Purchaser will receive two (2) documents at closing which Purchaser agrees to accept as proof that Purchaser's title is as represented above:

a) <u>A written commitment</u> from a title insurance company licensed in Florida agreeing to issue a policy insuring title, or the policy itself.  This commitment (or policy) will list any exceptions to title.  Permitted exceptions (exceptions which Purchaser agrees to take title subject to) are:

    i) Liability for all taxes or assessments affecting the Unit starting the year Purchaser receives title and continuing thereafter;

    ii) All laws, and all restrictions, covenants, conditions, limitations, agreements, reservations and easements recorded in the public records.  For example, zoning restrictions, property use limitations and obligations, easements (rights-of-way) and agreements relating to telephone lines, water and sewer lines and other utilities;

    iii) The restrictions, covenants, conditions, easements, terms and other provisions imposed by the documents contained or referred to in the Condominium Documents (and any other documents which Seller, in its sole discretion, believes to be necessary or appropriate) which are recorded, now or at any time after the date of this Agreement, in the public records;

    iv) Pending governmental liens for public improvements as of closing (Seller will be responsible, however, for certified governmental liens for public improvements as of closing; provided, however, that to the extent that any such certified liens are payable in installments, Seller shall only be responsible for those installments coming due prior to closing, and Purchaser hereby assumes all installments coming due after closing);

    v) Standard exceptions for waterfront property and artificially filled-in property which once was in navigable waters and all other standard exceptions for similar type properties;

    vi) All standard printed exceptions contained in an ALTA owner's title insurance policy issued in Miami-Dade County, Florida;

    vii) Any open Notice of Commencement related to Seller's construction or development of the Condominium (although Seller will provide an unsecured indemnification to the title insurer, on a form reasonably acceptable to Seller, to induce the title insurer to insure Purchaser's title without exception for unfiled construction liens relating to the Notice of Commencement).  To the extent that this transaction is governed by RESPA and Purchaser elects to obtain title services through its own sources rather than from Seller's designee, Seller will only provide the title insurer the same unsecured indemnification described above and, in such event, Purchaser shall be required to assume all obligations to obtain a title insurance commitment (and subsequent title insurance policy) without exception for unfiled construction liens, or otherwise, Purchaser agrees to take title subject to the Notice of Commencement and any related unfiled liens; and

UNIT:    __5-1907_____    UNIT TYPE:    __B_____

PURCHASER:   __ANTONIO BRITTO FILHO_____

viii)   Any matters not listed above, as long as affirmative title insurance is given for these matters.

Purchaser understands, however, that no limitation on Purchaser's title is anticipated to prohibit construction of the Unit, nor the use of it as a residence, subject to the Condominium Documents.

b)   <u>A Special Warranty Deed</u>.   At closing, Seller promises to give Purchaser a special warranty deed to the Unit.  The special warranty deed will be subject to (that is, contain exceptions for) all of the matters described above and taxes as described below.  To the extent that the transaction is governed by RESPA and in the event Purchaser elects to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, Purchaser will receive the special warranty deed described in Section 10(b) above which Purchaser agrees to accept as proof that Purchaser's title is as represented above.

Purchaser will also receive at closing a bill of sale for any appliances included in the Unit and Seller's form of owner's ("no lien") affidavit and FIRPTA (non-foreign) affidavit.  When Purchaser receives the special warranty deed at closing, Purchaser will sign a closing agreement and all papers that Seller deems necessary or appropriate.

If Seller cannot provide the quality of title described above, Seller will have a reasonable period of time (at least sixty (60) days) to correct any defects in title, but Seller will not be obligated to do so.  If Seller cannot or elects not to correct such title defects, Purchaser will have two options:

i)   Purchaser can accept title in the condition Seller offers it (with defects) and pay the full purchase price for the Unit with exceptions for such title matters to be contained in the special warranty deed for the Unit.  Purchaser will not make any claims against Seller because of the defects; or

ii)   Purchaser can cancel this Agreement and receive a full refund of Purchaser's deposits, and in such event, Seller will be relieved of all obligations under this Agreement (and otherwise) when Seller refunds the deposits to Purchaser.

Seller shall, at Seller's expense, deliver to Buyer, prior to or at closing, an owner's title insurance commitment ("Commitment"), prepared and issued by Seller's attorney, as agent for a nationally recognized title insurance underwriter.  Subsequent to closing, Seller shall cause its attorney or title agent to issue an owner's title policy ("Policy") at Seller's expense in accordance with the terms of the Commitment.  Seller shall not supply abstracts of title.  Buyer may elect to decline the Commitment provided by Seller, however, Buyer shall not be entitled to any credits toward or reimbursement of the cost of a title report or title insurance where Buyer elects to decline the Commitment or where Buyer elects to obtain its own title insurance policy elsewhere, as Seller is providing same at no cost to Buyer.

At the same time Purchaser receives the special warranty deed, Purchaser agrees to pay the balance of the purchase price and any additional amounts owed under this Agreement.  Until all sums have been received and cleared, Seller will be entitled to a vendor's lien on the Unit (which Purchaser will grant to Seller, in writing, at closing, or thereafter, at Seller's request).

11.   <u>Closing Costs</u>.  Purchaser understands that, in addition to the purchase price for the Unit, Purchaser must pay certain other fees or "closing costs" when title is delivered to Purchaser at closing. These include:

(a)   A "closing charge" equal to one and three quarters percent (1.75%) of the Purchase Price (and of any charges for options or extras now or hereafter contracted for which are not included in the Purchase Price).  This charge will be used, in part, to provide additional revenue to the Seller and to pay for the costs of officially recording the deed, for documentary stamp taxes on the special warranty deed, and in reimbursement for certain of Seller's closing administration expenses and Seller's attorneys' fees in connection with closing (all of which costs will be paid for by Seller).  The foregoing one and three quarters percent (1.75%) closing charge is based on the assumption that documentary stamp taxes on the special warranty deed will be, at closing, at the rate of sixty cents ($.60) for each one hundred dollars ($100.00) of Purchase Price and that surtax will not applicable with respect to the sale of the Unit.  In the event that: (i) surtax is imposed on the transaction; (ii) any sales tax is imposed in connection with the subject transaction; (iii) there is an increase in either the minimum title insurance rates or in the documentary stamp tax rate; (iv) any interim services fee is imposed by any governmental authority; or (v) any new governmental tax or charge on deeds is imposed, appropriate additional charges will be paid by Purchaser at closing.

(b)   To the extent that the transaction is governed by RESPA and Purchaser has elected, in the manner provided herein, to obtain a title insurance commitment and policy from its own sources, all costs in connection with title search, title review and the premium for the title insurance commitment and title insurance policy at the minimum promulgated risk rates promulgated by the Florida Insurance Commissioner (taking into account applicable reissue rates and new home credits, if any).

UNIT: __5-1907__                              UNIT TYPE: __B__

PURCHASER: __ANTONIO BRITTO FILHO__

(c)     Loan fees, closing costs, lender's attorney's fees, closing agent charges, escrows, appraisals, credit fees, lender's title insurance premiums, prepayments and all other expenses charged by any lender giving Purchaser a mortgage, if applicable.  The amount of these charges is now unknown.  Additionally, if Purchaser obtains a loan and elects to have Seller's closing agent act as "loan" closing agent as well, Purchaser agrees to pay, in addition to any other sums described in this Agreement, such closing agent a fee equal to seven hundred fifty dollars ($750.00), plus reimbursement of applicable costs, for the agent's title examination, title searching and closing services related to acting as "loan closing agent".  The amount of all lender's charges is now unknown.  If the transaction is governed by RESPA, Purchaser shall not be obligated to use Seller's closing agent as Purchaser's closing agent, and if Purchaser elects to use another agent, Purchaser will not be obligated to pay Seller's closing agent the amounts described in this paragraph (although Purchaser will be obligated to pay Purchaser's loan closing agent such fees and expenses as are agreed to by Purchaser and that closing agent).  Notwithstanding any of the references in this paragraph to coordinating closing with any lender that Purchaser may elect to obtain, nothing herein shall be deemed to make this Agreement, or Purchaser's obligations under this Agreement, conditional or contingent, in any manner on Purchaser obtaining a loan to finance any portion of the Purchase Price; it being the agreement of Purchaser that the provisions of paragraph 3 of this Agreement shall be paramount and that Purchaser shall be obligated to close on an "all cash" basis.

(d)     Working capital contributions in an amount equal to twice the monthly maintenance charge to become payable to the Condominium Association, which is payable directly to the Condominium Association to provide it with initial capital and will not be credited against regular assessments.

(e)     A reimbursement to Seller for any insurance prepayments or deposits and any utility, cable or interactive communication deposits or hook-up fees which Seller may have advanced prior to the closing of the Unit.  The amount of this charge is now unknown.

(f)     Any charge for any options or upgrading of standard items included, or to be included, in the Unit as agreed to in writing by both Purchaser and Seller.

(g)     Reimbursement to Seller, and/or Seller's closing agents, for charges incurred in connection with coordinating the closing with Purchaser and/or Purchaser's lender, including, without limitation, charges for overnight courier and local delivery expenses, long distance telephone calls, photocopying expenses, telecopying charges and others.  The amount of these charges is now unknown.

(h)     The late funding charges provided for elsewhere in this Agreement.  The amount of any such charges is now unknown.

(i)     In the event Seller allows any delay in closing (which it has no obligation to do) or any other change in closing (which it has no obligation to do), Seller may impose a "redraw fee" to reimburse Seller for any additional costs it incurs as a result of any such rescheduling or change.

(j)     A one-year Restaurant Food Credit Fee in the amount of One Thousand Dollars ($1,000.00).

Current expenses of the Unit (for example, taxes and governmental assessments and current monthly assessments of the Association will be prorated between Purchaser and Seller as of the date of closing.  Additionally, at closing, Purchaser shall be obligated to prepay the next month's maintenance assessment to the Association.  If taxes for the year of closing are assessed on the Condominium as a whole, Purchaser shall pay Seller, at closing, the Unit's allocable share of those taxes (as estimated by Seller and subject to reproration when the actual tax bill is available) for the Unit, from the date of closing through the end of the applicable calendar year of closing.  If taxes for the year of closing are assessed on a unit-by-unit basis, Purchaser and Seller shall prorate taxes as of the closing date based upon the actual tax bill, if available, or an estimate by Seller, if not available, with Purchaser being responsible for paying the full amount of the tax bill and Seller reimbursing Purchaser for Seller's prorated share of those taxes.  Purchaser agrees that Seller's prorated share of the taxes due as of closing need not be paid to Purchaser, however, until the actual tax bill is presented to Seller, and any proration based on an estimate of the current year's taxes shall be subject to reproration upon request of either party.  If the tax assessment is the subject of a protest, the reproration based on the actual tax bill will be postponed until a final determination of the tax assessment is adjudicated.  Seller shall have the right to litigate ad valorem tax matters, impact charges, service fees and interim and/or special assessments concerning the Unit, the Common Elements or any other portion of the Condominium for prior years and/or the year of closing.  BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE.  A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES.  IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.  This subparagraph shall survive (continue to be effective) after closing.

12.     Adjustments with the Condominium Association.  Purchaser understands that Seller may advance money to the Association to permit it to pay for certain of its expenses (for example, but without

UNIT: _____**5-1907**_____                                    UNIT TYPE: ___**B**___
PURCHASER: __**ANTONIO BRITTO FILHO**_____

limitation, insurance premiums, common utility and/or cable or other interactive communication charges and deposits, permit and license fees, charges for service contracts, management fees, salaries of employees of the Association and other similar expenses).  Seller is entitled to be reimbursed by the Association for all of these sums advanced by Seller.  The Association will reimburse Seller out of the initial contributions and regular assessments paid by Purchaser and other owners, as those contributions and assessments are collected, or as otherwise requested by Seller.  Seller also, at its election, may receive reimbursement for these payments by way of a credit against any sums it may become obligated to pay to the Association.  No initial contributions (by purchasers of units in the Condominium) to the Condominium Association may be used for such purposes, however, as long as any guaranty by Seller of the Condominium Association's assessments is in effect.  This subparagraph shall survive (continue to be effective) after Closing.

13.    <u>Default</u>.   If  Purchaser  fails  to  perform  any  of  Purchaser's  obligations  under  this Agreement (including making scheduled deposits and other payments), Purchaser will be in "default".  If Purchaser is still in default twenty (20) days after Purchaser has received written notice thereof, Seller shall be entitled to the remedies provided herein.

Upon Purchaser's default (and the expiration of any cure period, if applicable), all Purchaser's rights under this Agreement will terminate and Seller can resell the Unit without any accounting to Purchaser.  Purchaser understands that because Seller has taken the Unit off the market for Purchaser, has spent money on sales, advertising, promotion and construction, and has incurred other costs incident to this sale, Purchaser's default will cause damage to Seller.  If Purchaser defaults or breaches this Agreement after Purchaser has paid fifteen percent (15%) of the purchase price of the Unit, excluding any interest owed under this Agreement, the Seller shall refund to the Purchaser any amount which remains in excess of (a) fifteen percent (15%) of the purchase price of the Unit, excluding any interest owed under the Agreement, or (b) the amount of damages incurred by the Seller as a result of such breach, whichever is greater, from the amount paid by Purchaser with respect to the purchase price of the Unit.  The amount of the refund to Purchaser set forth above is calculated in accordance with and is intended  to  comply  with  the  requirements  of  the  Interstate  Land  Sales  Act  (15  U.S.C.  Section 1703(d)(3)). The amount of the deposit and any interest earned on it which remains after subtracting the amount of the refund to which Purchaser is entitled as provided above in this paragraph, shall be paid to Seller.

If Seller defaults under this Agreement, Purchaser will give Seller twenty (20) days' written notice of said default and if Seller has not cured the default within such period, Purchaser will have such rights as may be available under applicable law or in equity, except that Purchaser may not seek specific performance of Seller's obligations hereunder.

14.    <u>Construction Specifications</u>.   The Unit and the Condominium will be constructed in substantial accordance (in Seller's opinion) with the plans and specifications therefore kept in Seller's construction office, as such plans and specifications are amended from time to time (the "Plans and Specifications").  Seller may make such changes in the Plans and Specifications that it deems appropriate at any time, to accommodate its in the field construction needs (as more fully discussed in this paragraph 14) and in response to recommendations or requirements of local, state or federal governmental or quasi-governmental agencies or applicable utility and/or insurance providers, and Purchaser agrees that any changes made in accordance with the foregoing shall not be deemed material in a manner which is adverse to the offering of the Unit.  Such plans and specifications, as they are so amended, are referred to in this Agreement as "Seller's Plans and Specifications".  Without limiting Seller's general right to make changes, Purchaser specifically agrees that the changes described above and changes in the dimensions of rooms, patios and balconies, in the location of windows, doors, walls, partitions, utility (including, but not limited to, television and telephone) lead-ins and outlets, air-conditioning equipment, ducts and components, lighting fixtures, touch screen panels and electric panel boxes, and in the general layout of the Unit and Condominium, may be made by Seller, in its sole discretion and that such changes shall not be deemed material or adverse to Purchaser.  In furtherance of the understanding and agreement stated above, Purchaser acknowledges and agrees that it is a widely observed construction industry practice for preconstruction plans and specifications for any unit or building to be changed and adjusted from time to time  in  order  to  accommodate  ongoing,  "in  the  field"  construction  needs.    These  changes  and adjustments are essential in order to permit all components of the unit and the building to be integrated into a well-functioning and aesthetically pleasing product in an expeditious manner.  Because of the foregoing, Purchaser acknowledges and agrees that it is to Purchaser's benefit to allow Seller the flexibility to make such changes in the Unit and the Condominium.  Purchaser further acknowledges and agrees that: (i) the Plans and Specifications for the Unit and the Condominium on file with the applicable governmental authorities may not, initially, be identical in detail to Seller's Plans and Specifications; and (ii) because of the day-to-day nature of the changes described in this paragraph 14, the Plans and Specifications on file with the applicable governmental authorities may not include some or any of these changes (there being no legal requirement to file all changes with such authorities).  As a result of the foregoing, Purchaser and Seller both acknowledge and agree that the Unit and the Condominium may not be constructed in accordance with the plans and specifications on file with applicable governmental authorities.  Seller disclaims and Purchaser waives any and all express or implied warranties that construction will be accomplished in compliance with such Plans and Specifications.  Seller has not given and Purchaser has not relied on or bargained for any such warranties.

UNIT: __**5-1907**__                              UNIT TYPE: __**B**__

PURCHASER: __**ANTONIO BRITTO FILHO**__

Without limiting the generality of the foregoing, because of Seller's need to coordinate the appearance and design of the overall development of the Condominium, both in connection with the nature and layout of the land on which construction is to take place and of the street, common areas and other features of the development, Purchaser understands and agrees that the Unit may be constructed as a reverse ("mirror image") of that illustrated in the floor and building plan of the applicable model and building (as shown in the Condominium Documents or in any illustrations of the model and building) and may be "sited" in a position different from that of the applicable model and floor and building plan (or any such illustrations). Purchaser agrees to accept the Unit and the said building as "sited" by Seller and as constructed according to a reverse floor and/or building plan. This paragraph does not limit the generality of Seller's rights, set out elsewhere in this Agreement, to make other changes in the Unit, the Condominium and/or the Condominium Documents.

Purchaser understands and agrees that in designing the Condominium, the stairwells of the building were intended solely for ingress and egress in the event of emergency and, as such, are constructed and left unfinished solely as to be functional for said purpose, without regard to the aesthetic appearance of said stairwells. Purchaser understands and agrees that storage spaces, designated trash areas, service corridors, and back of house areas are constructed and left unfinished solely as to be functional without regard to the appearance of said trash areas, service corridors, and back of house areas. Further, Purchaser hereby acknowledges and agrees that sound transmission in a high-rise building such as the Condominium is very difficult to control, and that noises from adjoining or nearby Units, the parking garage equipment and or other mechanical equipment can often be heard in other Units. Seller does not make any representation or warranty as to the level of sound transmission between and among Units and the other portions of the Condominium Property, and Purchaser hereby waives and expressly releases any such warranty and claim for loss or damages resulting from sound transmission.

Purchaser understands and agrees that there are various methods for calculating the square footage of a Unit, and that depending upon the method of calculation, the quoted square footage of the Unit may vary. Additionally, as a result of in the field construction and other permitted changes to the Unit, as more fully described in this Section, actual square footage of the Unit may also be affected. Accordingly, during the pre-closing inspection, Purchaser should, among other things, review the size and dimensions of the Unit, and thereafter Purchaser shall be deemed to have conclusively agreed to accept the size and dimensions of the Unit, regardless of any variances in the square footage from that which may have been disclosed to Purchaser at any time prior to closing, whether included as part of Seller's promotional materials or otherwise. Without limiting the generality of any other provision of this Agreement, Seller does not make any representation or warranty as to the actual size, dimensions or square footage of the Unit, and Purchaser hereby waives and expressly releases any such warranty and claim for loss or damages resulting from any variances between any represented or otherwise disclosed square footage and the actual square footage.

Purchaser further agrees and understands that trees and landscaping which may be located on portions of the Condominium Property and Common Areas may be removed to accommodate construction. Seller does not guaranty the existence, replacement or survival of any trees and landscaping which are left or planted on any portion of the Condominium Property and Common Areas.

The agreements and waivers of Purchaser contained in this paragraph will survive (continue to be effective after) closing.

15.     Certain Items and Materials. Purchaser understands and agrees that the Unit is to be delivered in "decorator-ready" condition. "Decorator-ready" condition means that the Unit will be delivered in a condition where it is ready for decoration and finish by the Purchaser after closing.

Purchaser understands and agrees that certain items such as the following, which may be seen in models (if any) or in illustrations, are not included with the sale of the Unit: wall coverings, accent light fixtures, wall ornaments, drapes, blinds, furniture, knickknacks and other decorator accessories, lamps, mirrors, graphics, pictures, plants, wall-hung shelves, wet bars, intercoms, kitchen accessories, linens, window shades, certain built-in fixtures, carpets or other floor coverings and colors, wood trim, other upgraded items, balcony treatments (e.g., tile, brick, scored concrete or wood trim), planters, window screens, landscaping, and any other items of this nature which may be added or deleted by Seller from time to time. This list of items (which is not all-inclusive) is provided as an illustration of the type of items built-in or placed upon the models (if any) or shown in illustrations strictly for the purpose of decoration and example only. Items such as these will not be included in the Unit unless specifically provided for in a Rider or Schedule to this Agreement signed by both Purchaser and Seller. Certain of these items may not even be available. In the event that Seller does provide any of these or other items, however, Purchaser agrees to accept them, although not requested by Purchaser, as long as Purchaser is not required to pay for such items. There is no obligation for Seller to provide models, but if so provided, the foregoing disclaimers will apply.

Purchaser further understands and agrees that certain items and finishings, if included with the Unit, such as tile, cabinets, wood, stain, grout, wall and ceiling textures, cultured marble, mica and carpeting, are subject to size and color variations, grain and quality variations, and may vary in

UNIT: __5-1907_____   UNIT TYPE: __B_____
PURCHASER: __ANTONIO BRITTO FILHO_____

accordance with price, availability and changes by manufacturer from those shown in the models or in illustrations or included in Seller's Plans and Specifications or in the published list of standard items (if any). If circumstances arise which, in Seller's opinion, warrant changes of suppliers, manufacturers, brand names or items, Seller may substitute equipment, material, appliances, etc., with items which, in Seller's opinion, are of similar quality (regardless of cost). Purchaser also understands and acknowledges that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor (if any). Purchaser recognizes that certain colors as shown in displays or in models, including, but not limited to, carpeting and wood stain, will weather and fade and may not be duplicated precisely.

The agreements and waivers of Purchaser contained in this paragraph will survive (continue to be effective after) closing.

16.  Variations.  Purchaser understands that the color and texture of paint, carpet, stone, granite, marble, quartz and other items may vary from samples, and therefore, Seller shall not be responsible for variations in the color or texture of the finish of the items such as appliances, plumbing fixtures, paint, carpeting, tile and other items from samples due to such manufacturer variations, nor shall variations constitute an objection to closing or entitle Purchaser a reduction in the Purchase Price or to compensation therefore. Furthermore, any natural stone or wood products will have naturally inherent variations in color, graining, veining, finish and texture and will also vary from sample to sample. It is understood and agreed by Purchaser that, due to the nature of these products there will most likely be variations in installed products from those shown or displayed by Seller. Purchaser hereby accepts such variations, and such variations will not constitute an objection to closing or entitle Purchaser to compensation therefore, and Purchaser hereby releases, waives and holds Seller completely harmless from and against any and all responsibility for any such variation of such products.

If Seller allows Purchaser to select certain colors and/or materials in the Unit (which Seller is not obligated to do), Purchaser understands and agrees that Purchaser must submit his selections to Seller in writing within fourteen (14) days after the date the list of selections (if any) is made available to Purchaser. If these selections (if any) are not delivered to Seller in writing within the time period stated above, then it is agreed and understood that the choices will be made by Seller in Seller's sole discretion.

17.  Maintenance Fees. Purchaser understands and agrees that the Estimated Operating Budget for the Condominium Association contained in the Condominium Documents provides only an estimate of what it will cost to run the Association during the period of time stated in the Budget. The monthly assessments shown in the Condominium Association Budget for the Unit is guaranteed, if at all, in the manner stated in the Condominium Documents. The Budget itself however, as opposed to the levels of assessments payable to the Association, is not guaranteed to accurately predict actual expenditures. Changes in the Budget may be made at any time to cover increases or decreases in actual expenses or in estimates. It is intended that the Seller, as the sole Unit Owner upon the formation of the Condominium, will vote not to provide any reserves for the initial year of the Condominium Association. Thereafter, on an annual basis, a majority of the Condominium Association's members may vote to continue not to provide any reserves. If an election is, in fact, made to waive reserves, the assessments per unit payable to the Condominium Association will be as set forth in the Estimated Operating Budget as "Assessments per Unit - Without Reserves". If no such election is made, the assessments per Unit payable to the Condominium Association will be as set forth in the Estimated Operating Budget as "Assessments per Unit - With Reserves".

18.  Condominium Association.  This Agreement is also Purchaser's application for membership in the Condominium Association, which membership shall automatically take effect at closing. At that time, Purchaser agrees to accept the liabilities and obligations of membership.

19.  Seller's Use of the Condominium Property.  As long as Seller owns a Unit or Units or is offering any Unit for sale, it and its agents can keep offices and model apartments within the Condominium Property. Seller's salespeople can show these Units, erect advertising signs and do whatever else is necessary in Seller's opinion to help sell or lease Units or develop and manage the Condominium Property, but Seller's use of the Condominium Property must be reasonable, in Seller's opinion, and can't unreasonably interfere, in Seller's opinion, with Purchaser's use and enjoyment of the Unit. This paragraph will survive (continue to be effective after) closing.

20.  Sales Commissions.  Seller will pay all sales commissions due any in-house sales personnel and brokers hired by Seller, employed by Seller, and any cooperating broker who has entered into an agreement with Seller, in accordance with the terms of such agreement. By signing this Agreement, Purchaser is representing and warranting to Seller that Purchaser has not consulted or dealt with any other broker, salesperson, agent or finder other than Seller's sales associates and that Purchaser will indemnify and hold Seller harmless for and from any and all claims including but not limited to claims for commissions or compensation for any loss, liability, costs or expense, arising by, through or under Purchaser, made by such person or company claiming otherwise. Purchaser's indemnity and agreement to hold Seller harmless includes, without limitation, Purchaser's obligation to pay or reimburse Seller for all commissions, damages and other sums for which Seller may be held liable and all attorneys' fees and court costs actually incurred by Seller (including those for appeals and those accruing from alternative

UNIT:   __5-1907_____   UNIT TYPE:   __B_____
PURCHASER:   __ANTONIO BRITTO FILHO_____

dispute resolution proceedings), regardless of whether a lawsuit(s) is actually brought or whether Seller ultimately wins or loses.

Purchaser understands and agrees that Seller's in-house sales personnel and brokers hired by Seller are agents of Seller only (and are not Purchaser's agents and/or dual agents). As Seller's agents, they owe the following duties: (i) to Seller, a fiduciary duty to represent the interests of, and use utmost care, integrity, honesty and loyalty to, Seller, and (ii) to both Purchaser and Seller, the duty to diligently exercise reasonable skill and care in performance of the agent's duties, a duty of honesty and fair dealing and good faith, and a duty to disclose all facts known to the agent materially affecting the value or desirability of property that are not known to, or within the diligent attention and observation of the parties. Seller's agents are not obligated to reveal to either party any confidential information obtained from the other party which does not involve the affirmative duties of the agent(s) set forth in this paragraph.

This paragraph will survive (continue to be effective after) closing.

21.   Notices.  Whenever Purchaser is required or desires to give notice to Seller, the notice must be in writing and it must be sent by (a) certified mail, postage prepaid, with a return receipt requested, or (b) a recognized overnight courier service (i.e. Federal Express, United Parcel Service, etc.) to Seller at 3211 Ponce de Leon Boulevard, Suite 301, Coral Gables, Florida 33134, or other such address as Seller may otherwise direct. Notwithstanding the foregoing, Purchaser's notice to cancel pursuant to Paragraph 25 below may be made in any manner permitted by and/or under the Interstate Land Sales Full Disclosure Act and the regulations promulgated thereunder.

Unless this Agreement states other methods of giving notices, whenever Seller is required or desires to give notice to Purchaser, the notice must be given either in person, by telephone or in writing and, if in writing, it must be sent either by: (i) certified mail, postage prepaid, with a return receipt requested (unless sent outside of the United States, in which event written notices to Purchaser may be sent by regular air mail); (ii) facsimile transmission or electronic mail, if Purchaser has indicated a telecopy number or electronic mail address on Page 1 of this Agreement; or (iii) a recognized overnight courier service (i.e., Federal Express, United Parcel Service, etc.), to the address for Purchaser set forth on Page 1 of the Agreement.

A change of address notice is effective when it is received. All other written notices are effective on the day they are properly given or mailed, whether or not received (and all permitted non-written notices to Purchaser are effective on the date given by Seller) unless receipt is required specifically in portions of this Agreement.

22.   Transfer or Assignment.  Purchaser shall not be entitled to assign this Agreement or its rights hereunder without the prior written consent of Seller, which may be withheld by Seller with or without cause (and even if Seller's refusal to grant consent is unreasonable), in Seller's sole and absolute discretion. To the extent that Seller consents to any such assignment, said consent may be conditioned in any manner whatsoever, including, without limitation, charging an assignment or transfer fee established by Seller, in its sole and absolute discretion. Any such assignee must fully assume all of the obligations of Purchaser hereunder by written agreement for Seller's benefit, a counterpart original executed copy of which shall be delivered to Seller. For purposes of this Section 22, the sale, transfer or pledge of any beneficial interest in Purchaser shall be deemed an assignment hereunder requiring prior consent of Seller. If Purchaser is a corporation, partnership, other business entity, trustee or nominee, a transfer of any stock, partnership interest, equity, beneficial or principal interest in Purchaser will constitute an assignment of this Agreement requiring consent. Purchaser acknowledges and agrees that Seller's ability to sell other Units owned by Seller within the Condominium and the value of such Units owned by Seller will be diminished and harmed by Purchaser attempting to resell the Unit through any brokers (or otherwise) or advertising the Unit for sale in any publications prior to Purchaser receiving fee simple title to the Unit and that Seller shall be irreparably harmed by such actions. Therefore, Purchaser covenants and agrees not to enter into a listing agreement for the sale of the Unit with any broker anywhere within the United States or internationally, or to advertise or cause the Unit to be advertised for sale in any newspaper, trade magazine, or other publication anywhere in the United States or internationally, prior to obtaining fee simple title to the Unit. A breach of the provisions of this paragraph shall be a default hereunder by Purchaser entitling Seller to exercise its remedies under this Agreement.

Seller may assign or transfer freely all of its rights and obligations under this Agreement (including its rights in and to Purchaser's deposits and all other payments made by Purchaser).

23.   Others Bound by this Agreement.  If Purchaser dies or in any way loses legal control of his affairs, this Agreement will bind his heirs and personal representatives. If Purchaser has received permission to assign or transfer his interest in this Agreement, this Agreement will bind anyone receiving such interest, but will not otherwise relieve Purchaser of his obligation hereunder. If Purchaser is a corporation or other business entity, this Agreement will bind any successor corporation or entity. If more than one person signs this Agreement as Purchaser, each will be equally liable, on a joint and several basis, for the full performance of all Purchaser's duties and obligations under it, and Seller can enforce it against either of such individuals or together.

UNIT: __5-1907__                     UNIT TYPE: __B__

PURCHASER: __ANTONIO BRITTO FILHO__

24.    <u>Public Records</u>.  Purchaser authorizes Seller to record the documents needed to establish and operate the Condominium, as well as all other documents which Seller deems necessary or appropriate, in the Public Records of Miami-Dade County, Florida.  Neither this Agreement, nor any notice or memorandum hereof (nor any Lis Pendens), may be recorded.

25.    <u>Purchaser's Right to Cancel</u>.

**THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY THE BUYER, AND RECEIPT BY BUYER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER UNDER SECTION 718.503, FLORIDA STATUTES.  THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE SELLER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER.   ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT.  BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE ITEMS REQUIRED.  BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.  FIGURES CONTAINED IN ANY BUDGET DELIVERED TO THE BUYER PREPARED IN ACCORDANCE WITH THE CONDOMINIUM ACT ARE ESTIMATES ONLY AND REPRESENT AN APPROXIMATION OF FUTURE EXPENSES BASED ON FACTS AND CIRCUMSTANCES EXISTING AT THE TIME OF THE PREPARATION OF THE BUDGET BY THE DEVELOPER. ACTUAL COSTS OF SUCH ITEMS MAY EXCEED THE ESTIMATED COSTS.  SUCH CHANGES IN COST DO NOT CONSTITUTE MATERIAL ADVERSE CHANGES IN THE OFFERING.**

If Purchaser does not cancel this Agreement during this 15-day period, it means that Purchaser ratifies this Agreement and the Condominium Documents and Purchaser agrees that their provisions are fair and reasonable in Purchaser's opinion.

If Purchaser has the right to cancel this Agreement by reason of a change which materially alters or modifies the offering of the Condominium in a manner adverse to Purchaser, Purchaser's failure to request cancellation in writing within the 15-day period will mean that Purchaser accepts the change and waives irrevocably his right so to cancel.  All rights of cancellation will terminate, if not sooner, then absolutely at closing.  After closing, Purchaser will have no remedy for any changes Seller may make or have made.

If Purchaser cancels during the 15-day period, Seller will be relieved of all obligations under this Agreement when Seller refunds the deposits and interest.

26.    **ANY CLAIMS FOR CONSTRUCTION DEFECTS ARE SUBJECT TO THE NOTICE AND CURE PROVISIONS OF CHAPTER 558, FLORIDA STATUTES.**

27.    <u>Florida Law: Severability</u>.  Any disputes that develop under this Agreement will be settled according to Florida law.  If any part of this Agreement violates a provision of applicable law, the applicable law will control.  In such case, however, the rest of the Agreement (not in violation) will remain in full force and effect.

Without limiting the generality of the foregoing, it is Purchaser's and Seller's mutual desire and intention that all provisions of this Agreement be given full effect and be enforceable strictly in accordance with their terms.  If, however, any part of this Agreement is not enforceable in accordance with its terms or would render other parts of this Agreement or this Agreement, in its entirety, unenforceable, the unenforceable part or parts shall be judicially modified, if at all possible, to come as close as possible to the expressed intent of such part or parts (and still be enforceable without jeopardy to other parts of this Agreement, or this Agreement in its entirety), and then are to be enforced as so modified.  If the unenforceable part or parts cannot be so modified, such part or parts will be unenforceable and considered null and void in order that the mutual paramount goal (that this Agreement is to be enforced to the maximum extent possible, strictly in accordance with its terms) can be achieved.

Without limiting the generality of the foregoing, if the mere inclusion in this Agreement of language granting to Seller certain rights and powers, or waiving or limiting any of Purchaser's rights or powers or Seller's obligations (which otherwise would be applicable in the absence of such language), results in a final conclusion (after giving effect to the above judicial modification, if possible) that Purchaser has the right to cancel this Agreement and receive a refund of his deposits, such offending rights, powers, limitations and/or waivers shall be struck, canceled, rendered unenforceable, ineffective and null and void.  Under no circumstances shall either Purchaser or Seller have the right to cancel this Agreement solely by reason of the inclusion of certain language in this agreement (other than language which is intended specifically to create such a cancellation right).

UNIT:   **5-1907**                                          UNIT TYPE:   **B**

PURCHASER:   **ANTONIO BRITTO FILHO**

28.   Changes.   Seller may make changes in the Condominium Documents in its sole discretion.  Purchaser will have fifteen (15) days from the date of receipt of any such changes from Seller which materially alter or modify the offering of the Condominium in a manner adverse to Purchaser, in which to cancel this Agreement (by delivering written notice to Seller of such cancellation within such fifteen (15) day period) and receive a refund of any deposits with applicable interest thereon.  Seller will be relieved of all obligations under this Agreement when Seller refunds the deposits and interest.  Purchaser will not be permitted to prevent Seller from making any change it wishes to make in its sole discretion, nor to pursue any remedy other than the fifteen (15) day cancellation remedy described above (and then only for the kind of changes that materially alter or modify the offering in a manner that is adverse to Purchaser).

If Purchaser has the right to cancel this Agreement by reason of a change which materially alters or modifies the offering of the Condominium in a manner adverse to Purchaser, Purchaser's failure to request cancellation in writing within the fifteen (15) day period will mean that Purchaser accepts the change and waives irrevocably his right so to cancel.  All rights of cancellation will terminate, if not sooner, then absolutely at closing.  After closing, Purchaser will have no remedy for any changes Seller may make or may have made.

Without limiting the generality of the foregoing and other provisions of this Agreement or any independent rights of Seller to make changes to Condominium Documents, Seller is specifically authorized to: (i) substitute the final legal descriptions and as-built surveys for the proposed legal descriptions and plot plans contained in the Condominium Documents, even though changes occur in the permitting stage and during construction; and/or (ii) combine and/or subdivide units prior to the recordation of the Declaration (and incorporate divider wall common elements in any such combination units or add common element divider walls in any such subdivision), provided that the percentage share of ownership of common elements of any unit not affected in the combination or subdivision is not affected.  Such substitution, combination and/or subdivision shall not be deemed to be either material or adverse.  This paragraph 28 will survive (continue to be effective after) closing.

29.   Time of Essence.   The performance of all obligations of Purchaser on the precise dates and at the precise times stated in this Agreement is of absolute importance, and Purchaser's failure to so perform on time shall be deemed a default, time being of the essence.

30.   Disclaimer of Implied Warranties.   All manufacturers' warranties will be passed through to Purchaser at closing and all items covered by manufacturers' warranties are expressly not warranted by Seller.  At closing, Purchaser will receive the statutory warranties imposed by the Act in effect at the time of execution of this Agreement (to the extent applicable and not yet expired).

To the maximum extent lawful, all implied warranties of fitness for a particular purpose, merchantability and habitability, all warranties imposed by statute (except only those imposed by the Act, to the extent they cannot be disclaimed and to the extent they have not expired by their terms) and all other implied or express warranties of any kind or character are specifically disclaimed.  Seller has not given, and Purchaser has not relied on or bargained for, any such warranties.

As to any implied warranty which cannot be disclaimed entirely, all secondary, incidental and consequential damages are specifically excluded and disclaimed (claims for such secondary, incidental and consequential damages being clearly unavailable in the case of implied warranties which are disclaimed entirely above).  This paragraph 30 will survive (continue to be effective after) closing.

Purchaser acknowledges and agrees that Seller does not guarantee, warrant or otherwise assure, and expressly disclaims, any right to view and/or natural light.

Additionally, properties in South Florida are subject to tropical conditions, which may include quick, heavy rain storms, high blustery winds, hurricanes and/or flooding.  These conditions may be extreme, creating sometimes unpleasant or uncomfortable conditions or even unsafe conditions, and can be expected to be more extreme at properties like the Condominium.  At certain times, the conditions may be such where use and enjoyment of outdoor amenities such as the pool or pool deck and/or other areas may be unsafe and/or not comfortable or recommended.  These conditions are to be expected at properties near the water.  Each Purchaser understands and agrees to accept these risks and conditions and to assume all liabilities associated with same.  By executing and delivering this Agreement and closing, Purchaser shall be deemed to have released and indemnified Seller, Seller's Affiliates and Seller's third party consultants, including without limitation, Seller's architect, from any against any and all liability or claims resulting from same, including, without limitation, any liability for incidental or consequential damages (which may result from, without limitation, inconvenience and/or personal injury or death to or suffered by Purchaser or any of Purchaser's Guests as defined below and any other person or any pets).  Purchaser understands and agrees that neither Seller, Seller's Affiliates, nor any of Seller's third party consultants, including without limitation, Seller's architect, shall be responsible for any of the conditions described above, and Seller hereby disclaims any responsibility for same which may be experienced by Purchaser, its pets, its family members and/or its or their guests, tenants and invitees (collectively "Purchaser's Guests").

UNIT: _____**5-1907**_____ UNIT TYPE: _____**B**_____

PURCHASER: _____**ANTONIO BRITTO FILHO**_____

This Section shall survive (continue to be effective after) closing.

31.   <u>Return of Condominium Documents</u>.   If this Agreement is canceled for any reason, Purchaser will return to Seller all of the Condominium Documents delivered to him in the same condition received, reasonable wear and tear excepted.  If Purchaser fails to return the Condominium Documents, Purchaser agrees to pay Seller $50.00 to defray the costs of preparation, printing and delivery of same.

32.   <u>Roadways</u>.   Access to the Condominium is via Sunny Isles Boulevard, which is a seven (7) lane divided street.  Sunny Isles Boulevard is a public road, primarily maintained by the City of Sunny Isles Beach and Miami-Dade County.  A Private access drive within the Condominium will be constructed by Seller.  This private access drive will have at least one lane of traffic in each direction.  The cost of road construction will be borne by Seller, however, there is no financial assurance of completion of the private access drive.  See the Property Report delivered to Purchaser prior to the execution hereof for details regarding the maintenance of the private access road.

33.   <u>Waiver</u>.   Seller's waiver of any of its rights or remedies (which can only occur if Seller waives any right or remedy in writing) will not waive any other of Seller's rights or remedies or prevent Seller from later enforcing all of Seller's rights and remedies under other circumstances.

34.   <u>Survival</u>.   Only those provisions and disclaimers in this Agreement which specifically state that they shall have effect after closing will survive (continue to be effective after) closing and delivery of the deed.  All other provisions shall be deemed merged into the deed.

35.   <u>Substantial Completion</u>.   Whenever this Agreement requires Seller to complete or substantially complete an item of construction, that item will be understood to be complete or substantially complete when so completed or substantially completed in Seller's opinion.  Notwithstanding the foregoing, however, neither the Unit nor the building of which the Unit is a part will be considered complete or substantially complete for purposes of this Agreement unless the Unit (and such portion of the building intended to be used exclusively by Purchaser) is physically habitable and usable for its intended purpose.  The Unit (and such portion of the building) will be considered so useable if the Unit is ready for occupancy and has all necessary and customary utilities extended to it.  Other units (and other portions of the building) may not necessarily be so complete and useable.  Before Seller can require Purchaser to close on title to the Unit, Seller agrees that no closing shall occur until the Declaration has been amended to include the certificate required by Section 718.104(4)(e), Florida Statutes.

36.   <u>Radon</u>.   Under the laws of the State of Florida, Purchaser is hereby advised that radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from the Miami-Dade County Public Health Unit.  The foregoing notice is provided in order to comply with state law and is for informational purposes only.  Seller does not conduct radon testing with respect to the Unit or the Condominium, and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions with respect to the Condominium.

37.   <u>Representations and Confirmations</u>.   Purchaser acknowledges, warrants, represents and agrees that this Agreement is being entered into by Purchaser without reliance upon any representations concerning any potential for future profit, any rental income potential, tax advantages, depreciation or investment potential and without reliance upon any other monetary or financial advice. Purchaser acknowledges and agrees that no such representations, including representations as to the ability or willingness of Seller or its affiliates to assist Purchaser in renting or selling the Unit, have been made by Seller, or any of its agents, employees or representatives. This Agreement contains the entire understanding between Purchaser and Seller, and Purchaser hereby acknowledges that the displays, architectural models, artist renderings and other promotional materials contained in the sales office and model suite are for promotional purposes only and may not be relied upon.  Purchaser warrants that Purchaser has not relied upon any verbal representations, advertising, portrayals or promises other than as expressly contained herein and in the Condominium Documents, including, specifically, but without limitation, any representations as to: (a) potential appreciation in, or resale value of, the Unit; (b) the existence of any "view" from the Unit or that any existing "view" will not be obstructed in the future; (c) traffic conditions in, near or around the Condominium; (d) disturbance from nearby properties; (e) disturbance from air or vehicular traffic; and/or (f) any future use of adjacent properties.

38.   <u>Incorporation: Definitions</u>.   The explanations, definitions, disclaimers and other provisions set forth in the Condominium Documents are incorporated into this Agreement as if repeated at length here.  When the words "this Agreement" are used, they shall include, in their meaning, all modifications, riders and addenda to it signed by Purchaser and Seller.

39.   <u>Entire Agreement</u>.   This Agreement is the entire contract for the sale and purchase of the Unit and once it is signed, it can only be amended by a written instrument signed by the party against whom enforcement is sought which specifically states that it is amending this Agreement.  Any current or prior agreements, representations, understandings or oral statements of sales representatives or others,

UNIT: _____ **5-1907** _____ UNIT TYPE: _____ **B** _____

PURCHASER: _____ **ANTONIO BRITTO FILHO** _____

if not expressed in this Agreement or the Condominium Documents, are void and have no effect. Purchaser has not relied on them.

40. <u>Casualty</u>. Prior to closing, Seller shall assume all risk of loss by reason of fire, windstorm or other casualty. If a casualty occurs to the Condominium Property prior to closing, Seller may, at Seller's option, either cancel this Agreement and return all deposits placed hereunder, in which event this Agreement shall become void and of no effect, or rebuild as soon as possible, in which event this Agreement shall be in full force and effect, provided, however, that such reconstruction is accomplished within the time specified in Paragraph 7 hereinabove. Under no circumstances shall Purchaser have any interest in any insurance proceeds attributable to said casualty. Until closing is completed, Purchaser shall not be entitled to any insurance proceeds from a casualty or proceeds resulting from any condemnation.

41. <u>Move-In Date</u>. Purchaser shall be entitled to possession of the Unit as of the closing date; however, Purchaser's right to move into the Unit shall be subject to a "move-in" schedule for all purchasers and the move must be scheduled with the Association, or its manager. Moving shall only be permitted in accordance with the Rules and Regulations of the Association.

42. <u>Miami-Dade County Ordinance 93-21</u>. Pursuant to the mandates of Miami-Dade County Ordinance 93-21 and the provisions of Chapter 11C of the Metropolitan Dade County Code, Purchaser is hereby advised, and acknowledges and agrees, that the Unit is located in (i) coastal high hazard area, and (ii) a special flood hazard area. If the Unit is below the applicable flood elevation level and is substantially damaged or substantially improved, as defined in Chapter 11C of the Metropolitan Dade County Code, it may, among other things, be required to be raised to the applicable flood elevation level.

43. <u>Litigation</u>. In the event of any litigation between the parties under this Agreement, the prevailing party shall be entitled to reasonable attorney fees and court costs at all trial at appellate levels. In addition, in the event of any litigation between the parties under this Agreement, the parties shall and hereby submit to the jurisdiction of the state and federal courts of the State of Florida.

PURCHASER AGREES TO WAIVE THE RIGHT TO TRIAL BY JURY IN THE EVENT LEGAL PROCEEDINGS ARE INSTITUTED BY EITHER PARTY HERETO IN CONNECTION WITH THIS AGREEMENT.

This section will survive (continue to be effective after) any termination of this agreement, and shall otherwise be deemed merged into the deed at closing.

44. <u>BUDGETS</u>. FIGURES CONTAINED IN ANY BUDGET PREPARED IN ACCORDANCE WITH THE CONDOMINIUM ACT ARE ESTIMATES ONLY AND REPRESENT AN APPROXIMATION OF FUTURE EXPENSES BASED ON FACTS AND CIRCUMSTANCES EXISTING AT THE TIME OF THE PREPARATION OF THE BUDGET BY THE DEVELOPER. ACTUAL COSTS OF SUCH ITEMS MAY EXCEED THE ESTIMATED COSTS. SUCH CHANGES IN COST DO NOT CONSTITUTE MATERIAL ADVERSE CHANGES IN THE OFFERING.

45. <u>Offer</u>. The submission by Seller of this Agreement to Purchaser for examination does not constitute an offer by Seller to Purchaser, or a reservation of or option for any unit in the Condominium. This Agreement shall not become binding until executed and delivered by both Purchaser and Seller. Upon execution by Seller, an executed copy of this Agreement shall be sent to Purchaser or Seller shall otherwise demonstrate its acceptance of Purchaser's offer. Otherwise any such offer shall be considered rejected.

46. <u>Miscellaneous</u>. The explanations, definitions, disclaimers and other provisions set forth in the Condominium Documents are incorporated into this Agreement as if repeated at length here. When the words "this Agreement" are used, they shall include in their meaning all modifications, riders and addenda to it signed by Purchaser and Seller. Purchaser acknowledges that the primary inducement for Purchaser to purchase under this Agreement is the Unit itself, and not the recreational amenities and other Common Elements.

47. <u>Nearby Construction</u>. Purchaser understands and agrees that for some time or times in the future Purchaser may be disturbed by the noise, commotion and other unpleasant effects of a nearby construction activity and impeded in using portions of the Condominium Property by that activity. As a result of the foregoing, there is no guarantee of view, security, privacy, location, design, density or any other matter, except as is set forth herein or in the Prospectus. Additionally, inasmuch as the Commercial Units may attract customers, patrons and/or guests who are not members of the Association, such additional traffic over and upon the Common Elements shall not be deemed a nuisance hereunder.

48. <u>Interpretation</u>. Notwithstanding that this Agreement was prepared by one party hereto, it shall not be construed more strongly against or more favorably for either party; it being known that both parties have had equal bargaining power, have been represented (or have had the opportunity to be represented) by their own independent counsel and have equal business acumen such that any rule of construction that a document is to be construed against the drafting party shall not be applicable. Purchaser acknowledges and agrees that Purchaser has had ample opportunity to inspect other similar

UNIT: _____**5-1907**_____ UNIT TYPE: ___**B**_____

PURCHASER:__**ANTONIO BRITTO FILHO**_____

condominiums and condominium documents, that Seller has clearly disclosed to Purchaser the right to cancel this Agreement for any reason whatsoever, including any dissatisfaction Purchaser may have with this agreement or the Condominium Documents, within fifteen (15) days of the date Purchaser executes this Agreement or has received the Condominium Documents, whichever is later, and that although Seller's sales agents are not authorized to change the form of this Agreement, they have strict instructions from Seller to communicate any of Purchaser's requests for such changes to Seller's management, which has given Purchaser the opportunity to discuss and negotiate such changes.

49.     A legible facsimile or electronic (including "pdf") copy of this Agreement and any signatures hereon shall be considered for all purposes as an original.

*[SIGNATURES ON NEXT PAGE]*

UNIT: _____ **5-1907** _____ UNIT TYPE: ___ **B** _____

PURCHASER: __ **ANTONIO BRITTO FILHO** _____

**ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO SELLER PRIOR TO CLOSING PURSUANT TO THIS AGREEMENT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE SELLER.**

YOU HAVE THE OPTION TO CANCEL YOUR CONTRACT OR AGREEMENT OF SALE BY NOTICE TO THE SELLER UNTIL MIDNIGHT OF THE FIFTEENTH DAY FOLLOWING THE SIGNING OF THE CONTRACT OR AGREEMENT.

IF YOU DID NOT RECEIVE A PROPERTY REPORT PREPARED PURSUANT TO THE RULES AND REGULATIONS OF THE BUREAU OF CONSUMER FINANCIAL PROTECTION, IN ADVANCE OF YOUR SIGNING THE CONTRACT OR AGREEMENT, THE CONTRACT OR AGREEMENT MAY BE CANCELED AT YOUR OPTION, FOR TWO YEARS FROM THE DATE OF SIGNING.

Witnesses:

_Regione Micheloni_
_Regione Micheloni_

_Yara Gouveia_

PURCHASER

Print Name: _ANTONIO BRITTO FILHO_

Print Name: _____

Date: _____

_Mary Lincoln_
_Mary Lincoln_

SELLER:

Parque Towers Developers, LLC,
a Florida limited liability company

By: _____

Print Name: _____

Date: _12/24/14_

UNIT #: 5-1907
PURCHASER: ANTONIO BRITTO FILHO

## RECEIPT FOR CONDOMINIUM DOCUMENTS (By Alernative Media)

The undersigned acknowledges that the documents checked below have been received or, as to plans and specifications made available for inspection

Name of Condominium:        Parque Towers, A Condominium

Address of Condominium:      300-350 Sunny Isles Boulevard, Sunny Isles Beach, Florida

Place a check in the column by each document received or, for the plans and specifications, made available for inspection.  If a document uses a different name, substitute the current name or place in parenthesis.  If an item does not apply, place "N/A" in the column

| DOCUMENT | RECEIVED BY HARD COPY | RECEVED BY ALTERNATIVE MEDIA |
|---|---|---|
| Prospectus Text | N/A | X |
| Declaration of Condominium | N/A | X |
| Articles of Incorporation | N/A | X |
| By-Laws | N/A | X |
| Estimated Operating Budget | N/A | X |
| Form of Agreement for Sale or Lease | N/A | X |
| Rules and Regulations | N/A | X |
| Covenants and Restrictions | N/A | N/A |
| Ground Lease | N/A | N/A |
| Management and Maintenance Contracts for More than One Year | N/A | N/A |
| Renewable Management Contracts | N/A | N/A |
| Lease of Recreational and Other Facilities to be Used Exclusively by Unit Owners of Subject Condominium(s) | N/A | N/A |
| Lease of Recreational and Other Facilities to be used by Unit Owners with Other Condominium(s) | N/A | N/A |
| Declaration of Servitude | N/A | N/A |
| Sale Brochures | N/A | N/A |
| Phase Development Description | N/A | N/A |
| Form of Unit Lease if a Leasehold | N/A | N/A |
| Description of Management for Single or Management of Multiple Condominium | N/A | N/A |
| Conversion Inspection Report | N/A | N/A |
| Conversion Termite Inspection Report | N/A | N/A |
| Plot Plan | N/A | X |
| Floor Plan | N/A | X |
| Survey of Land and Graphic Description of Improvements | N/A | X |
| Frequently Asked Question and Answer Sheet | N/A | X |
| Financial Information | N/A | N/A |
| Executed Escrow Agreement | N/A | X |
| Evidence of Developer's Ownership, Leasehold or Contractual Interest in the Land Upon which the Condominium is to be Developed | N/A | X |
| Condominium Governance Form | N/A | X |
| Energy Efficiency Brochure | N/A | X |
| Alternative Media Disclosure Statement | X | X |
| Plans and Specifications | Made Available | Made Available |

initials → 

11345322.1

UNIT #:  5-1907
PURCHASER: ANTONIO BRITTO FILHO

THE PURCHASE AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THE PURCHASE AGREEMENT BY THE BUYER AND RECEIPT BY THE BUYER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER.  THE AGREEMENT IS ALSO VOIDABLE BY THE BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER BUYER HAS RECEIVED ALL OF THE DOCUMENTS REQUIRED.  BUYER'S RIGHT TO VOID THE PURCHASE AGREEMENT SHALL TERMINATE AT CLOSING.

Executed this _27_ day of _december_ , 20 _14_ .

_____
Signature of Purchaser or Lessee
PURCHASER: ANTONIO BRITTO FILHO

_____
Signature of Purchaser or Lessee
PURCHASER:_____

initials ⟶

UNIT #: 5-1907
PURCHASER: ANTONIO BRITTO FILHO

## ALTERNATIVE MEDIA DISCLOSURE
## PARQUE TOWERS, A CONDOMINIUM

DEVELOPER/ SELLER: **PARQUE TOWERS DEVELOPERS, LLC**, a Florida limited liability company.

**BUYER:**   ANTONIO BRITTO FILHO                    *Please print you name here* →

**SELLER DISCLOSURE:**

The Seller is offering to Buyers the option of election to accept the Condominium Documents (as defined in the Purchase Agreement) in the form of a computer CD or a digital file attachment to an electronic mail (such as a PDF file) in lieu of receiving hard copies of the Condominium Documents.  Please note that before the Buyer makes this election, the Buyer should review the system requirements necessary to properly view and print the Condominium Documents set for below.

**SYSTEM REQUIREMENTS:**

Type of alternative media being offered:  CD-ROM Disk; Adobe Acrobat file
Operating System necessary to run the alternative media:  Windows 95/98/ME/2000 or later versions; Adobe Acrobat
Memory required to run the alternative media:  64 MB
Hard drive requirements to run the alternative media: NONE
Processor speed required to run the alternative media:  200 MHZ
Software requirements in order to view the alternative media (if any): Adobe Acrobat Reader or any other PDF reader
Printer requirements in order to print the documents from the alternative media:  NONE

**BUYER CERTIFICATION:**

The Buyer hereby certifies that it was the Buyer's choice to accept the condominium documents in the form of an alternative media in lieu of the hardcopies.

The Buyer further certifies that the Buyer has reviewed the above-referenced System Requirements and that the Buyer will be able to view the documents within the fifteen (15) day cancellation period that is set forth in the Purchase Agreement.

**WITNESSES:**

_Kegione Picheloni_
Signature of Witness

Regione Micheloni
Print Witness Name

_(signature)_
Signature of Witness
Xara Gouveia
Print Witness Name

_Mally Lice_
Signature of Witness
Mally Lincoln
Print Witness Name

_(signature)_
Signature of Witness
Maria Baena
Print Witness Name

**BUYER:**

_(signature)_
Print Name: ANTONIO BRITTO FILHO

Date of Signature: 12/27/14

ANTONIO BRITTO FILHO

*Please sign, write your name and date here* →

**SELLER:**
PARQUE TOWERS DEVELOPERS, LLC, a
Florida limited liability company

By: _____
Authorized Representative

Date of Signature: 12/27/14

11345349.1

UNIT #:  5-1907
PURCHASER:  ANTONIO BRITTO FILHO

## COST SHEET, SIGNATURE OF SENIOR EXECUTIVE OFFICER

In addition to the purchase price of your Unit, there are other expenditures which must be made. Listed below are the major costs. There may be other fees for use of the recreational facilities. All costs are subject to change.

Sales Price of Unit          $  1,285,000.00

### Estimated One-Time Charges

You will pay a closing charge equal to one and one and three-quarters percent (1.75%) of the Total Purchase Price. This closing charge will be used, in part, to pay for the costs of documentary stamp taxes affixed to the deed of conveyance and the cost of recording the deed.          $  22,487.50

The premium for an Owner's title insurance policy, if you choose to obtain an Owner's title insurance policy on your own, rather than accepting the policy offered by Seller at Seller's expense.          $  (undetermined)

If the purchase is being financed, you will bear all costs and expenses of such financing, including the cost of lender's title insurance policy and any title insurance endorsement requirements by such lender.          $  (undetermined)

At closing, you will pay an amount equal to twice the monthly assessment amount payable to the Condominium Association (which contributions are not to be credited against regular assessments).          $  1,645.28

Reimbursement to Seller for any utility, cable or interactive communication deposits or hook-up fees which Seller may have advanced prior to closing for the Unit.          $  $2,000.00

Any charge for any options or upgrading of standard items included, or to be included, in the Unit as agreed to in writing by both Buyer and Seller.          $  (undetermined)

Taxes, the current maintenance assessments due to the Condominium Association and other proratable items will be prorated as provided in the Purchase Agreement.          $  (undetermined)

Reimbursement to Seller, and/or Seller's closing agents, for charges incurred in connection with coordinating closing with Buyer and/or Buyer's lender, including, without limitation, charges for messenger expenses, long distance telephone calls, photocopying expenses, telecopying charges and others.          $  $950.00

If you choose to be represented by an attorney or other closing agent, payment of your own attorney or closing fee shall be at your expense.          $  (undetermined)

Total of Sales Price and Estimated One Time Charges:          $  1,312,082.70

initials ⟶ 

23

UNIT #:   5-1907

PURCHASER:   ANTONIO BRITTO FILHO

**Estimated annual charges, exclusive of utility use fees**

1.   Taxes-Unit Assessed at $ 1,028,000.00              $ 26,728.00

2.   Condominium Association Assessment              $ 9,871.68

The information contained in this Property Report is an accurate description of our Condominium and development plans.

PARQUE TOWERS DEVELOPERS, LLC, a Florida limited liability company

By: _____

Rex Barker, Manager

11336167.1

initials →

24

UNIT #: 5-1907
PURCHASER: ANTONIO BRITTO FILHO

## RECEIPT, AGENT CERTIFICATION AND CANCELLATION PAGE

Purchaser Receipt

*Important: Read Carefully*

Name of Condominium:  **Parque Towers, A Condominium**

ILSRP number:          **ILSRP 32706-11-2013**          Date of Report: **February 3, 2014**

We must give you a copy of this Property Report and give you an opportunity to read it before you sign any contract or agreement.  By signing this receipt, you acknowledge that you have received a copy of our Property Report.

Received by: _____          Date: 12/27/2014                    *please sign, date and complete here ←*
Street address: RUA JACUNDA  380  CASA 21
City: SAO PAULO          State: SP          Zip: 05679 060

If any representations are made to you which are contrary to those in this Report, please notify the:

Bureau of Consumer Financial Protection
1700 G Street NW
Washington, D.C. 20552

### AGENT CERTIFICATION

I certify that I have made no representations to the person(s) receiving this Property Report which are contrary to the information contained in this Property Report.

Unit: 5-1907 of Parque Towers, A Condominium

Name of salesperson:_____
Signature:_____          Date:_____

### PURCHASE CANCELLATION

If you are entitled to cancel your purchase contract, and wish to do so, you may cancel by personal notice, or in writing.  If you cancel in person or by telephone, it is recommended that you immediately confirm the cancellation by certified mail.  You may use the form below.

Name of Condominium: of Parque Towers, A Condominium

Date of contract:_____

This will confirm that I/we wish to cancel our purchase contract.

Purchaser(s) signature:_____          Date:_____

26

UNIT #: 5-1907
PURCHASER: ANTONIO BRITTO FILHO

## PURCHASER RECEIPT

*Important: Read Carefully*

Name of Condominium:   **Parque Towers, A Condominium**

ILSRP number:          **ILSRP 32706-11-2013**                  Date of Report: **February 3, 2014**

We must give you a copy of this Property Report and give you an opportunity to read it before you sign any contract or agreement.  By signing this receipt, you acknowledge that you have received a copy of our Property Report.

Received by: _MBrill_                          Date: _12/27/2014_         please sign, date and complete here →
Street address: _RUA JACUNJA 380 CASA 21_
City: _SÃO PAULO_                  State: _SP_          Zip: _05679060_ ←

If any representations are made to you which are contrary to those in this Report, please notify the:

Bureau of Consumer Financial Protection
1700 G Street NW
Washington, D.C. 20552

### AGENT CERTIFICATION

I certify that I have made no representations to the person(s) receiving this Property Report which are contrary to the information contained in this Property Report.

Unit: 5-1907 of Parque Towers, A Condominium

Name of salesperson:_____
Signature:_____  Date:_____

### PURCHASER CANCELLATION

If you are entitled to cancel your purchase contract, and wish to do so, you may cancel by personal notice, or in writing.  If you cancel in person or by telephone, it is recommended that you immediately confirm the cancellation by certified mail.  You may use the form below.

Name of Condominium: Parque Towers, A Condominium

Date of contract:_____

This will confirm that I/we wish to cancel our purchase contract.

Purchaser(s) signature:_____  Date:_____

25

## FIRST ADDENDUM TO PURCHASE AGREEMENT

**THIS FIRST ADDENDUM** ("Addendum") is made as of the 16th day of January, 2015 (the "Effective Date") by and between **PARQUE TOWERS DEVELOPERS, LLC, a Florida limited liability company** ("Seller") and <u>**ANTONIO BRITTO FILHO**</u> ("Buyer").

### R E C I T A L S

A.     Seller and Buyer have entered into that certain Purchase Agreement, dated December 27th, 2014 (the "Agreement") for the purchase and sale of **Unit <u>5-1907</u>** ("Unit") in **PARQUE TOWERS, A CONDOMINIUM** ("Condominium").

B.     The parties desire to amend the Agreement in certain respects as more particularly set forth below.

**NOW, THEREFORE**, in consideration of the execution and delivery of the Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     <u>Recitals</u>.   The foregoing recitals are true and correct and are incorporated herein as if repeated at length.  Unless the context otherwise requires, all initial capitalized terms used but not defined in this Addendum, shall have the meaning or meanings given to such terms in the Agreement.  This Addendum shall be deemed a part of, but shall take precedence over and supersede any provisions to the contrary contained in, the Agreement.  All references in the Agreement or this Addendum to the Agreement shall be deemed to refer to the Agreement as modified by this Addendum, unless the context otherwise requires.

2.     <u>Assignment</u>.  Seller hereby agrees that Buyer may assign its interests in and to the Agreement to an affiliated Florida corporate entity ("Florida Corporate Entity") provided that the following requirements are met:

A.     The holder of one hundred percent (100%) of the beneficial ownership interests is Buyer and Buyer's immediate family, including spouse and children, must own one hundred percent (100%) of the beneficial ownership interests in the Florida Corporate Entity and provide Seller with documentation reflecting same;

B.     Buyer must provide Seller with a copy of the Articles of Organization (and other corporate documents, including the tax identification number for the Florida Corporate Entity) for the Florida Corporate Entity within thirty (30) days of the date hereof.

C.     The Buyer's right to rescind the Agreement pursuant to Section 718.503(1)(a), Florida Statutes must have terminated.

D.     Buyer must have made all deposits required to have been made as of the date of the Assignment.

E.     Seller has reviewed the documentation for the Florida Corporate Entity and has provided its written approval of same.

F.     All other provisions contained in Section 22 of the Purchase Agreement shall remain in full force and effect.

G.     Buyer shall execute the Assignment on a form provided by Seller.

Notwithstanding the Assignment by Buyer to a Florida Corporate Entity, Buyer shall remain liable to Seller under the terms and conditions of the Agreement to and including the closing of the transaction contemplated by the Agreement.

2.     <u>No Rescission.</u>   The execution of this Addendum shall neither extend, toll, nor reinstate any rights of the Buyer to rescind the Agreement pursuant to the terms thereof, or of Section 718.503(1)(a), Florida Statutes.  Notwithstanding the foregoing, in the event that it is determined that the execution of this Addendum does serve to extend, toll or reinstate any rights of Buyer to rescind the Agreement pursuant to its terms or the terms of Section 718.503(1)(a), Florida Statutes, then Buyer expressly understands and agrees that any such rescission right shall only be effective and apply to the terms and provisions of this Addendum.

5.     <u>Miscellaneous</u>.  This Addendum may be executed in any number of counterparts and by the separate parties hereto in separate counterparts, each of which when taken together shall be deemed to be one and the same instrument.  Signatures of the parties hereto on copies of this Addendum transmitted by facsimile machine shall be deemed originals for all purposes hereunder, and shall be binding upon the parties hereto.   The captions in this Addendum are for convenience and are not intended to affect the interpretation of the terms hereof.

6.     <u>Ratification</u>.  Except as expressly modified hereby, the Agreement is hereby ratified and confirmed in all respects.

**EXECUTED** as of the date and year first above written.

**Buyer:**                                                    **Seller:**

                                                              **PARQUE TOWERS, LLC, a Florida limited liability company**

_____
ANTONIO BRITTO FILHO

                                                              By:    _____
                                                                      Authorized Representative

# EXHIBIT B



# First American Title Insurance Company

*13450 West Sunrise Blvd., Suite 300*
*Sunrise, Florida  33323*
*Tel: (954) 839-2900 / Toll-Free: (800) 327-1018 / Fax: (877) 532-7058*

April 2, 2019

Re:   PARQUE TOWERS- Unit #**5-1907**
        Our Escrow File No. 2884804

To Whom It May Concern:

Pursuant to your request, below is the deposit information of the funds received in Escrow by First American Title Insurance Company for **Antonio Britto Filho** for the purchase of the above referenced Unit at Parque Towers.

Deposits Received:                                            $642,500.00

Construction Funds disbursed to Developer:      $514,000.00

Surety Bond Draw to Developer:                        $0.00

Monies currently held by First American Title Insurance Co.:      $128,500.00

All funds have cleared.

Sincerely,

*Alma H. Kirk*
Alma H. Kirk
First American Title Insurance Company
Escrow Department

# EXHIBIT C

LAW OFFICES OF

# Rodrigo S. Da Silva

March 28, 2019

**Via Federal Express**

Parque Towers Developers, LLC
Attention: Yosi Gil
3211 Ponce de Leon Boulevard, Suite 301
Coral Gables, FL 33134

**RE: Seller Default – Parque Towers Condominium, Unit 5-1907**.

Dear Mr. Gil:

Please be advised that this office represents Antonio Britto Filho ("Buyer"). This letter shall serve as formal notice of Seller's default under the Agreement described below.

As you know, on or about December 27, 2014, Buyer executed that certain purchase agreement (the "Agreement") between Buyer and Parque Towers Developers, LLC ("Seller") for Unit No.: 5-1907 ("Unit"), in the Parque Towers Condominium. The purchase price for the unit was $1,285,000.00.  As required by the Agreement, the Buyer provided deposits to the seller in the aggregate amount of $642,500.00.

Section 7 of the Agreement provides, *inter alia*, that the unit would be substantially completed by December 31, 2017 ("Outside Date"). The Agreement further provides, in section 9, **that in no event will the Closing Date for the Unit be scheduled later than one year following the Outside Date.**

December 31, 2018, has passed, the Unit is not substantially complete, and the Closing has not occurred.  The Unit is still not substantially complete and the Closing has not occurred. Although Buyer has timely met all its obligation under the Agreement, Seller is in default due to its failure to substantially complete the Unit by December 31, 2017 and schedule the Closing by December 31, 2018.  Pursuant to Section 13 of the Agreement, **Seller is hereby given notice of default and shall have 20 days from the date of this letter within which to cure its default**. If Seller is unable to cure its default and substantially complete and close the sale of the Unit within 20 days from the date of this letter, the Agreement shall be deemed terminated and Buyer demands that his deposits be immediately returned.

If Seller fails to cure its default or return all of the Buyer's funds, Buyer will seek such remedies that are available at law and equity.  We sincerely hope that this matter can be resolved

Parque Towers Developers, LLC
March 28, 2019
Page 2 of 2

amicably without the need for judicial intervention.  Nothing contained in this letter shall be construed as a waiver of any of Buyer's rights or remedies, each of which are expressly reserved. Should you wish to discuss this matter further, feel free to contact the undersigned.

Sincerely,

Rodrigo S. Da Silva

# EXHIBIT D

**LAW OFFICES OF ROBERT P. FRANKEL, P.A.**
**Royal Palm I at Southpointe**
**1000 South Pine Island Road, Suite 410**
**Plantation, Florida 33324**
**(305) 358-5690**
**(305) 907-5901 FAX**

Robert P. Frankel
robert@frankelpa.com

April 1, 2019

Rodrigo S. Da Silva, Esq. - rodrigo@rdasilvalaw.com
777 W. 41st Street, Suite 402
Miami Beach, Florida 33140

> *Our Client:*   ***Parque Towers Developers, LLC***
> *Purchaser:*   ***Antonio Britto Filho***
> *Unit No.:*     ***5-1907***
> *Our File No.: 5738.12*

Dear Mr. Da Silva:

I represent Parque Towers Developers, LLC which provided me with your March 28, 2019 letter sent by Federal Express. From this point forward, please direct all further communications to me as counsel for Parque Towers Developers, LLC.

The developer anticipates receiving the required certificates of occupancy for the subject building within the next few weeks, if not sooner. At the appropriate time, your client will be provided with a written notice to close and other instructions. If your client fails to close on the unit, the developer will exercise its legal and contractual rights to declare your client in default.

I do not agree with your legal analysis and interpretation of the purchase and sale agreement and the applicable completion date paragraph. The project did experience significant delays including but not limited to force majeure events – Hurricane Irma – other related factors, geological and unforeseen conditions and several other events.

Therefore, on behalf of Parque Towers Developers, LLC, your demand for the return of the deposit funds is rejected. Should you care to discuss the matter, please feel free to contact me.

Sincerely yours,

**Law Offices of Robert P. Frankel, P.A.**

By _/s/ Robert P. Frankel_____
      ROBERT P. FRANKEL

RPF:alt